IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JOHN L. WILLIAMS,                )
                                           )
                    Movant,        )
                                           )
vs.                                 )    Case No. 11-0307-CV-W-ODS
                                         )    Crim. No. 07-00272-02-CR-W-ODS
UNITED STATES OF AMERICA,    )
                                           )
               Respondent.      )

ORDER AND OPINION DENYING MOTION FOR POSTCONVICTION RELIEF

I.  BACKGROUND

Movant was indicted on three counts of bank robbery and three counts of using a firearm in connection with a crime of violence (the crimes of violence being the aforementioned bank robberies).[1]  The robberies in question were:

- July 21, 2007, robbery of U.S. Bank

- June 22, 2007, robbery of Union Bank, and

- May 21, 2007, robbery of United Catholic Credit Union.[2]

The bulk of the evidence came in the form of testimony from others involved in the crimes, and a summary of that evidence follows.  Marc Kindred testified he, Movant, and Landein Craddock were introduced to the idea of robbing banks by Cortez Thorp.  Tr. at 213-14.[3]  The four of them discussed robbing the United Catholic Credit Union in

---

[1]Movant was also charged with one conspiracy count, but the Government dismissed that count before trial commenced.

[2]The Court recognizes that, technically, banks and credit unions are not the same things.  However, they are both federally insured financial institutions and they are treated the same for purposes of 18 U.S.C. § 2113.  For ease of discussion, the term "bank" will be used to refer to all three institutions.

[3]"Tr. at __" is a reference to the Trial Transcript.

Raytown, Missouri. According to Craddock, the idea to rob that particular institution came from Movant, who said he had a friend who banked there. Tr. at 311. Kindred testified that he and Movant cased the place the Friday before the planned robbery. Tr. at 216. Movant stole a car for use during the robbery. They tried to rob the credit union on Saturday but arrived after it was closed, so they waited until Monday. Movant was the driver, and only Craddock and Kindred entered the bank; both Craddock and Kindred were armed. Tr. at 217, 311-17. They then drove to an apartment complex where they had previously parked Kindred's Cadillac, and eventually went to Kindred's house to split the money. Tr. at 223-24, 317-18.

Before the Union Bank robbery Craddock arranged for his girlfriend, Joegina Davis, to go in the bank to assess its security. Tr. at 321-22, 350. The group also added Jason Strothers, who drove Kindred, Craddock and Movant to the bank in a van Movant had stolen for that purpose. Tr. at 226-27, 320-21. Strothers stayed in the car and the other men robbed the bank. All three men were armed. Movant was armed with an assault weapon; Kindred and Craddock identified Exhibit 177 as the weapon Movant carried during the robbery. Tr. at 228-29, 323-26. Zaric Brown testified the AK47 was his and that he had provided it to Movant and that later Movant threatened to tell authorities that his gun was used in the robbery. Tr. at 109-11. After the robbery, they went to Movant's house to divide the money. Tr. at 230, 332. Later, Movant, Craddock and Kindred went to Davis' house where they continued discussing the robbery in her presence. Tr. at 350-52.

Movant, Kindred, Brown, Herman Hampton and Diallo Pruitt all participated in the U.S. Bank robbery. Kindred and Movant discussed the idea with Brown early on the morning of the robbery, and later that day went to look at the bank. They saw what they thought might be a security vehicle, so Brown – who was slated to be the driver – agreed to go into the bank to evaluate its security. Pruitt (Brown's cousin) was enlisted to be the driver, and Hampton was called to meet at Brown's house. Tr. at 100-03, 147, 240-44. Everyone eventually met at Brown's house, which was very near Movant's house. Later, Brown left to check out the bank, and the other four men went to Movant's house to wait. While waiting, Movant was cleaning glass and fingerprints from

a van he had stolen for use in the robbery.  Tr. at 148-51, 173-74, 244-45.  Before Brown could report the results of his investigation, the other men realized they only had one gun between them – Kindred's .25 caliber pistol that he had handed to Hampton. Pruitt called Brown, who related he had a TEC 9 submachine gun.  He called his wife (Monique) and told her to unload the gun and give it to Pruitt.  Tr. at 104-08, 138.[4]  After the submachine gun was obtained, and while waiting to hear from Brown, the men continued waiting at Movant's house.  Movant produced two hooded sweatshirts, a pillow case (which was later used to carry money) and an orange shirt.  The orange shirt was torn into pieces to be used to cover the men's faces.  Movant put on one of the hooded sweatshirts, and Hampton put on the other one; Movant's was black, and the one Hampton wore was blue and had the words "New York" on the front.  Tr. at 179-80, 252.  As planned, Hampton, Movant and Kindred entered the bank.  Kindred carried the pillowcase and was not armed, Hampton had the pistol Kindred gave him, and Movant carried the TEC 9.  Tr. at 154, 185.

Meanwhile, after telling Kindred there was no security guard in the bank, Brown proceeded to the apartment complex where Kindred had parked his Ford Bonco.  The stolen van carrying Pruitt, Hampton, Kindred and Movant eventually arrived, and the four men got into Kindred's Bronco and drove to Movant's house, with Brown following in his vehicle.  Tr. at 115-16.  At some point, Kindred got his gun back from Hampton. Upon arriving at Movant's house, somebody called Brown and told him to meet them at Movant's house, but Brown expressed concern about a helicopter that seemed to be following the Bronco.  Upon realizing the helicopter was focused on them the men scattered from the Bronco.

---

[4]Pruitt's and Monique's testimony coincides on this point.  The testimony is also consistent in establishing that Movant carried the TEC 9 during the robbery.  The Court notes that the accounts of who actually got the firearm from Monique differ.  See Tr. at 138-39 (Monique says Movant picked up the gun); Tr. at 151 (Pruitt says he got the gun and gave it to Movant); Tr. at 178 (Hampton says Kindred and Movant left to get gun from Monique); Tr. at 246 (Kindred says all four men went to Brown's house to get gun from Monique, but does not specify who went to the door).

- Pruitt testified he went East, trying to look inconspicuous and continuing to call Brown. He saw Hampton and Movant running into a wooded area to the North. Later, Movant told him he hid in the woods until the helicopter left, then called a friend at work to pick him up. Tr. at 158-64.
- Hampton testified he and Movant ran North; Movant stopped in the wooded area while he continued going North. Tr. at 197.
- Kindred testified he threw the pistol by the house but did not run because the Bronco was his and he figured there was no use in running. Instead, he got in the Bronco and started backing out of the driveway – but he was stopped and arrested before he could finish pulling out. Tr. at 260-61.

In addition to this testimony, various pictures and eyewitnesses established that two men entered the credit union and three men entered the Union Bank and U.S. Bank. However, the robbers successfully covered their faces so it is impossible to identify anyone's face. Eyewitness testimony established that a third person was involved in the credit union robbery; the two robbers were seen entering a red Jeep Cherokee that was driven by a third person. Eyewitness testimony also established that a fourth person was involved in the U.S. Bank Robbery; the three robbers were seen getting into a white van that was moving slowly to the door to pick them up. Finally, cell phone records were introduced that confirmed the exchange of phone calls between the people involved. Additional details will be discussed as necessary in the context of Movant's arguments.

Movant appealed; his attorney raised issues related to sentencing and Movant was permitted to file supplemental briefs. The Court of Appeals affirmed the conviction and sentence, and the Supreme Court declined to issue a Writ of Certiorari. United States v. Williams, 599 F.3d 831 (8th Cir.); cert. denied, 130 S. Ct. 2134 (2010).

## II. DISCUSSION[5]

## A. Ineffective Assistance of Trial Counsel

Movant asserts various allegations of ineffective assistance of trial counsel.  A claim of ineffective assistance of counsel is governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).  "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'"  Nave v. Delo, 62 F.3d 1024, 1035 (8th Cir. 1995), cert. denied, 517 U.S. 1214 (1996) (quoting Lawrence v. Armontrout, 961 F.2d 113, 115 (8th Cir. 1992)).  This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,"  Strickland, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions.  Id. at 689.  Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'"  Lawrence, 961 F.2d at 115 (quoting Strickland, 466 U.S. at 694).

Id.  Failure to satisfy both prongs is fatal to the claim.  Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); see also DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000).

---

[5]There is no need for a hearing in this case because all of Movant's claims can be fully analyzed based on the current Record.

1. Failure to Impeach Based on Witness' Possession of Discovery

Movant complains that his trial attorney did not properly impeach his co-defendants regarding their possession of discovery. It is common practice for the United States Attorney's Office to make discovery available to defendants' attorneys, who are then permitted to share that information with their clients in order to evaluate plea offers or prepare for trial. However, defense attorneys are not supposed to provide their clients with copies of the information. Movant's theory is that his co-defendants tailored their testimony to the information provided by the Government in order to implicate him.

Movant's argument is really limited to Hampton.[6] On cross-examination Hampton denied receiving copies of FBI or police reports. Tr. at 202. Movant claims he possessed a letter Hampton sent to his attorney that would have impeached Hampton on this point. Movant has provided the first page of a multi-page, handwritten letter directed to Hampton's attorney. Assuming the letter was written by Hampton, and assuming the Court would have permitted counsel to impeach Hampton on this matter (instead of deeming it to be a collateral matter), Movant's argument fails because the excerpt provided does not indicate Hampton had physical possession of the Government's discovery.

In any event, there can be no prejudice under Strickland. Movant's co-defendants were not strangers to the crime. It is not as if Movant is alleging that a "jailhouse informant" discovered details of the crimes and then fabricated a confession attributed to Movant. The co-defendants were charged with and admitted to the very same crimes – so they didn't *need* the Government's evidence to learn about the crimes' details. Moreover, they had legitimate access to the Government's evidence because it was provided to their attorneys for their use in defending against these charges. If Movant's co-defendants were inclined to fabricate, they could do so based

---

[6]Kindred testified that the only police reports and other documents he saw were the ones provided by Movant. Tr. at 267, 275.

solely on this legitimate access and did not need actual possession of anything. Thus, establishing that the co-defendants had possession of documents – in addition to (1) their own personal involvement in the crimes and (2) their legitimate access to the evidence to see the Government's case – would not have created a reasonable probability of a different outcome.

## 2. Failure to Impeach on Other Issues

Movant next contends his attorney failed to properly impeach witnesses on other issues. The Court will discuss each one separately.

Movant contends Kindred should have been impeached on his testimony that he "agreed to cooperate at the scene of the arrest." There is no prejudice for two reasons. First and foremost, Movant has not accurately stated Kindred's testimony. After Kindred was arrested, and "[l]ater that day," he was interviewed by Special Agent McCrary of the FBI. During that interview, Agent McCrary presented Kindred with evidence matching Kindred's shoe print to a shoe print apparently found on the counter at U.S. Bank. Kindred then decided to confess. Tr. at 261-63, 266-67.[7] Kindred never testified that he confessed at the scene of his arrest. Second, even if Kindred had made this statement, the difference is of such little consequence that it could not have any effect on the outcome.

Movant contends Pruitt should have been impeached with his initial statement indicating he did not know Movant. Contrary to Movant's claim, Pruitt was cross-examined on this point. Tr. at 165.

Officer Joshua Gasper was the third witness Movant contends was not effectively impeached. Officer Gasper was the first to arrive (after the police helicopter) and

---

[7]Movant suggests a videotape of the interview by Agent McCrary depicts Kindred's initial professions of innocence. This is not inconsistent with Kindred's testimony. In any event, there is no chance the outcome would have been different had the jury known that Kindred (unsurprisingly) initially denied involvement in the robberies until he was presented with evidence (i.e., his shoe print, found on the tellers' counter) placing him at the scene of the crime.

stopped Kindred as he was backing the Bronco out of Movant's driveway. While effectuating Kindred's arrest, Officer Gasper "broadcast[ ] the fact that individuals were running northbound from that scene along the fence line." When asked, Officer Gasper testified he saw two people running north. Tr. at 72. Movant contends this is contradicted by Gasper's report, which does not mention seeing two people running from the scene. Once again, the Court discerns no prejudice. Gasper's report focused on the arrest of Kindred. There is no doubt that four people (including the getaway driver, who did not enter the bank) actually participated in the robbery. One (Kindred) was arrested – clearly, the other three men went somewhere. Pruitt admitted traveling East, and Hampton admitted running north. Both testified that Movant also ran north – but ultimately, the direction that the fourth man ran (and whether Gasper saw him) is of little consequence.

Finally, Movant contends that Hampton, Kindred and Pruitt were not adequately impeached based on their plea agreements. The Trial Transcript belies this claim; all cooperating witnesses were diligently cross-examined regarding the consequences and benefits of their pleas.

### 3.  Failure to Utilize Alibi Witnesses

Movant contends trial counsel failed to interview Rochelle Burgess, who could have provided alibi testimony. He also contends he failed to interview Marcus Williams; while Williams testified, Movant contends that without a prior interview trial counsel was unable to ask the crucial questions necessary to develop Williams' alibi testimony.

Movant explains that the robbery occurred at 11:34, the police arrived at his house at 11:45, yet he was seen at work at noon. He contends it was impossible for him to have arrived at work in fifteen minutes, given that he lives approximately forty blocks from his place of employment.[8]

_____

[8]Of course, nobody ever suggested Movant arrived at work on foot. The Mapquest page Movant supplied indicates travel time from his house to his place of employment is twelve miles by car – and Pruitt testified Movant claimed to have

Marcus has provided an affidavit, averring he had a single, five minute conversation with trial counsel, during which he reported seeing his uncle at 1:00; this testimony was elicited during trial. Marcus' affidavit also reports telling trial counsel "that prior to that [Movant] called . . . at 11:35 inquiring about the party. The number on my Caller I.D.. indicated he was at his place of work (R & R Auto Body)." At the time (but no longer) he still had the cell phone with the information establishing the call, and actually brought it with him to the courthouse. However, Marcus was not asked any questions about the phone call during the trial, so he did not volunteer this information.

Strictly speaking, this is not a case of failing to interview a witness: regardless of how brief the interview may have been, Marcus declares that he revealed the existence of the phone call. Movant's claim, then, can only be that trial counsel failed to ask questions about the phone call.[9] Strategic decisions of this sort are entitled to a presumption of reasonableness because (as Marcus' affidavit establishes) counsel was aware of the evidence or testimony. E.g., White v. Roper, 416 F.3d 728, 732 (8th Cir. 2005), cert. denied, 546 U.S. 1157 (2006). The physical proof – assuming it existed – would not have established that Movant that called from the body shop. Moreover, Marcus' testimony on this point would have contradicted that of the body shop's owner (Aaron Winters), who was called as an alibi witness and testified Movant arrived "noonish." Tr. at 436. Trial counsel, aware of Marcus' and Winters' testimony, could reasonably prefer to rely on Winters because he was not related to Movant.[10]

_____

arranged for a friend to pick him up and take him to work. The most that eyewitnesses could establish is that Movant was at work "around noon" or "noonish."

[9]The Court is not persuaded by the Government's contention that questions were asked that invited Marcus to talk about a prior phone call. Questions were asked about Marcus encountering Movant on the street around 1:00, at which time Marcus was asked if he had a conversation with his uncle. In context, this question invited testimony about conversations between Movant and Marcus during the 1:00 encounter – it did not ask about prior conversations that may have occurred. Tr. at 423.

[10]The Court does not attribute any failing in trial counsel instructing Marcus to, as Marcus stated in his affidavit, answer "only the questions I ask." This is a common instruction attorneys direct to witnesses.

Burgess has provided a handwritten account of what she would have testified about. She explains she and her daughter went to Movant's house at 8:30 and he drove them to the body shop where he worked. She then recounts having phone conversations with him "from about 8:30 a.m. til around noon on June 22, 2007." However, she did not actually see him again until 11:30 or 11:40. Given that the Union Bank Robbery occurred at approximately 10:45, Burgess' testimony is not really that helpful.

Movant suggests the failure to call Burgess is automatically prejudicial because trial counsel failed to interview her. This legal conclusion is incorrect even if counsel failed to interview Burgess. At worst, the failure to interview her deprived his decision of any presumption of reasonableness. E.g., White, 416 F.3d at 732. The content of Burgess' statement demonstrates her testimony would not have provided Movant with an alibi for the June 22, 2007, robbery of Union Bank, so there was no prejudice in failing to call elicit her testimony.

### 4. Failure to Interview or Call Witnesses to the Robberies

Movant contends the Assistant Manager at U.S. Bank told police that the robber armed with the TEC 9 was 6'0", light skinned, wore a dark, baggy/loose-fitting hooded sweatshirt, and sounded like he was approximately twenty-three years old. Two customers gave similar descriptions. This, he contends, contrasts with his own characteristics: 5'9", medium complexion, and forty-five years old.

Purely for the sake of argument, the Court will accept that these witnesses provided police with the descriptions Movant has detailed. There are several reasons why Movant was not prejudiced. First, the robbery lasted between one and two minutes. E.g., Tr. at 39, 46, 154-55. Second, the descriptions are not particularly exonerating. An estimation of a person's height that is three inches off given (1) the time for observation and (2) the circumstances of the opportunity to view the person brandishing a semi-automatic weapon hardly seems significant. Judging a person's age by their voice under these circumstances – particularly in the absence of a reason to

think the robber would speak normally to assist subsequent identification – is also of no consequence. Finally, it must be remembered that the jury saw pictures of the robbers – so they had at least the same (and arguably a better) opportunity to make whatever comparisons were possible as did the bank employees and customers.

## *5. Alibi Instruction Not Requested*

Movant contends counsel was ineffective for failing to request an alibi instruction. The Government contends there was no prejudice because the evidence fell short of demonstrating Movant was not at the scene of the U.S. Bank robbery, and the Court agrees. In addition, the failure to provide such an instruction is rarely harmful, particularly when the substance of the defense is argued to the jury (as it was in this case), the jury is instructed that the Government must prove all elements beyond a reasonable doubt, and the jury is instructed that those elements include certain conduct by the defendant himself. E.g., United States v. Edwards, 159 F.3d 1117, 1131 (8th Cir. 1998) (citing United States v. Dawn, 897 F.2d 1444, 1450 (8th Cir. 1990)); see also McGonagle v. United States, 137 Fed. Appx. 373, 377 (1st Cir. 2005); Duckett v. Godinez, 67 F.3d 734, 743-44 (9th Cir. 1995). As the Ninth Circuit explained in Duckett, while an alibi instruction might be required when requested, that does not automatically mean that the failure to request one prejudices the defendant. 67 F.3d at 744-45.

## *6. Failure to Discover Perjured Testimony*

During questioning of Craddock, the Government attempted to ask questions relating to the Union Bank Robbery that was the subject of this case. This proved somewhat difficult because Craddock had robbed various banks (including a different branch of Union Bank) without Movant's involvement. In attempting to specify the robbery to be discussed, the Government referred to the Union Bank robbery on June 21, 2007 – which was the incorrect date. The correct date was June 22, 2007; the date

was somehow transposed with the date of the U.S. Bank robbery, which was *July* 22, 2007.

This was an innocent error. It did not transform Craddock's subsequent testimony into perjury, nor did it prejudice Movant.

### *7. Failure to Object to Prejudicial Remarks*

Movant has identified several statements he claims were prejudicial and to which objections should have been lodged. The Court will discuss each one separately.

*(a)*: During Monique Brown's testimony, she was asked about the phone call she received from her husband. Movant's counsel interposed a hearsay objection, and the Government indicated that the statement was admissible under Rule 801(d)(2)(E) because "[i]t's a statement by the conspirators in the conspiracy." Tr. at 138. The conspiracy count was dismissed before trial, but this did not preclude use of Rule 801(d)(2)(E) to admit evidence. Movant contends counsel should have objected because the count was no longer in the case, so the Government was proving a crime that did not exist. Movant further clarified this claim in his Reply Suggestions, explaining his argument is "about making the jury aware that there is a conspiracy (uncharged crime) or was." There was no prejudice under Strickland because (1) the Government did not state that a conspiracy had been charged, (2) the jury heard abundant evidence establishing the existence of an agreement between multiple people to commit or aid in the commission of bank robberies, and (3) the jury was not instructed to consider a conspiracy charge.

*(b)*: When discussing preparations for the Union Bank robbery, Kindred testified Movant was stealing the cars used in the crimes. When asked whether Movant was "stealing them specifically for the bank robberies," Kindred said some "were being stolen specific for bank robberies. Some of them were being used for other things he was doing." Tr. at 227.

In all probability, an objection to the statement regarding other car thefts unrelated to the bank robberies would have been sustained. However, the Court does

not believe there is any possibility that the outcome of this trial would have been different had an objection been made.  The jury heard admissible evidence about three car thefts related to bank robberies, and this single, fleeting reference to other car thefts was inconsequential.

*(c):*    Alton Shaw testified that Movant talked to him about the robberies.  During those conversations, Movant talked about the fact that Kindred was cooperating with the Government and said that "[i]f they could have got to [Kindred], they could have done probably something [sic] to him if they could have got to him."  Tr. at 392.  This paralleled Kindred's testimony that Movant was "complaining" about his cooperation.  Tr. at 275.

Movant insists this evidence served only one purpose: to inflame the jury.  This is incorrect.  "'We have ruled a number of times . . . the evidence of death threats against witnesses or other parties cooperating with the government is generally admissible against a criminal defendant to show consciousness of guilt of the crime charged.'"  United States v. Zierke, 618 F.3d 755, 759 (8th Cir. 2010) (quoting United States v. DeAngelo, 13 F.3d 1228, 1232 (8th Cir.), cert. denied, 512 U.S. 1224 (1994)).  The same logic applies to threats that fall short of death threats, and Counsel's failure to object could not be prejudicial because the objection would have been overruled.

*(d):*    Kindred participated in a second robbery of the credit union before the Union Bank robbery.  Movant did not participate in this second robbery.  Kindred explained that when they went to get Movant "he had been up all night doing drugs and he kept, he would come out, talk with us and he would go back in and lay down, fall asleep.  Kept going back and forth.  And we just went on.  We did it without him."  Tr. at 224-25.

Movant contends this evidence should have been the subject of an objection.  The Court tends to agree.  However, as with the evidence about unrelated car thefts, this single, fleeting reference to drug use was inconsequential.

*(e):*    Later in his testimony, Kindred was asked questions about a bank robbery on State Line Road.  He was asked "Who was involved in this robbery?"  An objection was posed and a discussion was had at the bench.  The Court sustained the objection and excluded any evidence regarding this robbery.  Tr. at 231-33.  Movant contends a

curative instruction or mistrial should have been requested. Addressing the latter contention first, the Court holds there was no prejudice because a mistrial would not have been justified. Movant claims the questions were asked in "blatant violation of [a] pre-trial ruling," but Movant does not identify (and the Court cannot locate) any such order. With respect to a curative instruction, the Court discerns no possibility that the trial's outcome would have been different. The jury did not hear any testimony connecting Movant to this robbery. The mere fact that the question was asked did not connect him to it and the jury was not led to believe that Movant participated in all robberies discussed. Ultimately, the lack of a curative instruction had no effect on the trial.

_**(f):**_ Kindred referred to the AK47 as a "chopper." Tr. at 228. Craddock was asked if there was a street name or other term for an assault rifle, to which he replied "A chopper." He then confirmed that Movant "had a chopper." Tr. at 324-26. Movant contends these three usages of an assault rifle's street name prejudiced him and should have been the subject of an objection. The Court disagrees. The use of slang is not inherently objectionable, and there is nothing about the term "chopper" that generates prejudice. Neither of <u>Strickland</u>'s prongs was violated by trial counsel's failure to object.


## _8. Failure to Object to Lack of Chain of Custody_


Movant complains about the lack of a proper chain of custody for the AK47. His argument misapprehends the law regarding authentication of evidence. "The requirement of authentication or identification as a condition precedent is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). This can be demonstrated by a person testifying "that a matter is what it is claimed to be." Fed. R. Evid. 901(b)(1). A person is competent to testify that a tangible object belongs to them, and this testimony is sufficient to establish that the item is what it is claimed to be. A chain of custody is one means of accomplishing this objective – but it is not the only means of doing so.

Here, Brown testified that the AK47, admitted as Exhibit 177, was his.  He identified the receipt for the AK47 he purchased that contained the serial number, and the serial number on the receipt matched the serial number on Exhibit 177.  Tr. at 109-11.  Contrary to Movant's argument, this is sufficient to establish the authenticity of the AK47, and neither <u>Strickland</u> prong was violated by counsel's failure to object.  Movant's surrounding arguments, most of which regard the existence or nonexistence of a stipulation to admit the gun into evidence, are simply irrelevant to the issue of whether the gun was admissible.

### *9.  Failure to Investigate*

Movant generally alleges counsel failed to investigate.  This claim does not contain any specifics and therefore presents nothing for the Court's consideration.

### *10.  Failure to Review File with Movant*

Movant contends his attorney was ineffective for failing to spend enough time reviewing the file with him.  The Record reflects this was a constant complaint of Movant's throughout the proceedings.  He consistently sought new counsel, asserting this as the reason; counsel denied Movant's assertions and represented that he had met with Movant and had discussed the Government's evidence with him.

The Court holds this claim advances nothing entitling Movant to relief and is not cognizable.  <u>Strickland</u> does not dictate that a certain number of meetings between attorney and client occur; it only dictates that counsel act within the wide range of professionally accepted conduct.  Should an attorney fail to do so, then a defendant might be entitled to relief if he was prejudiced by that failing.  To say that counsel did not sufficiently discuss the case with Movant can really only be evaluated if there is something in the performance that prejudiced Movant.  If there was no prejudice, then more meetings between attorney and client were not necessary.  Movant has not suggested any prejudice outside the context of his other, more specific claims.  In short,

this claim is only as good as his other claims, and it cannot succeed where those fail – and if another claim succeeds, this one adds nothing.

## 11.  Failure to be Familiar With the Evidence

In his eleventh allegation of ineffective assistance, Movant reiterates his complaints regarding the AK47 admitted as Exhibit 177.  He also contends counsel did not know before trial (1) whether the AK47 was real or a picture and (2) that the Government recovered two sweatshirts and not just one (an issue that will be discussed in the next subsection).  Movant has other claims regarding the assault rifle and the sweatshirts, and does not suggest how this claim is different from, or created prejudice different from, those other claims.  The Court views this claim as redundant.

## 12.  Refusal to Have Defendant Try On Sweatshirt

Movant contends that before trial he asked his attorney to let him try on the blue sweatshirt, and his attorney agreed.  The purpose for this experiment was to prove that the blue sweatshirt fit tightly and was not "loose fitting and baggy" as described by witnesses.  In contrast, at a hearing held after the trial, counsel explained that he did not want to try the experiment for the first time in front of the jury but wanted Movant to try the sweatshirt on in the Marshal's lock-up (an imminently reasonable tactic that competent counsel would take) – but Movant refused.

Ultimately, it does not matter.  All of the evidence established that the robber identified as Movant wore the *black* sweatshirt, which was not introduced into

evidence.[11]  The manner in which the *blue* sweatshirt fit is irrelevant, and the lack of proof did not prejudice Movant.

### 13.  Failure to Discuss Testimony

Like the claims discussed in Parts II(A)(9) and (10), this claim does not offer anything that is not already encompassed in other claims.  For that reason, this claim is denied.

### 14.  Failure to Advise of Severe Penalties

By statute, the three robbery charges carried a statutory range of punishment of not more than twenty-five years.  The first gun charge carried a mandatory minimum seven year consecutive sentence, and the second and third gun charges carried a mandatory minimum twenty-five years consecutive sentence, each.  Movant contends his attorney failed to tell him the gun charges had to be run consecutively; had he known, he might have been more inclined to accept the Government's plea offer.

Movant was advised of the possible range of punishment when the charges were initially read to him.  See Docket Entry 43 (Minute Sheet from First Appearance and Arraignment); Docket Entry 68 (Minute Sheet from Arraignment on Superseding Indictment); Docket Entry 122 (Minute Sheet from Arraignment on Second Superseding Indictment).  Two weeks after the Arraignment on the Second Supersiding Complaint,

---

[11]Government's Exhibit 46, a "Blue hooded sweatshirt with 'New York' on front," was admitted into evidence.  This was identified by numerous witnesses (including Hampton) as the sweatshirt Hampton wore.  This is the sweatshirt Movant claims he wanted to try on.  The Government's Exhibit Index lists, as Exhibit 39, "Hoodie recovered from Bronco."  This item was not offered into evidence.  The Court does not know why it was not offered into evidence.  Kindred testified that Movant threw some clothes "out in his yard and one jacket he left in the back" of the Bronco.  Tr. at 260.  The Court does not know if this is the black sweatshirt Movant is alleged to have worn.  Ultimately, none of this matters because Movant does not complain he should have been allowed to put on the sweatshirt he is actually alleged to have worn.

Movant filed a pro se motion to dismiss the case based on the Government's vindictiveness. Docket Entry 131. Attached to his motion was a letter from the Government's attorney to Movant's trial attorney reminding all concerned that the gun charges carried mandatory consecutive sentences. Thus, the Record belies Movant's claim that he did not know the gun charges carried mandatory consecutive sentences.

In addition, Movant also fails to demonstrate prejudice. He writes that he "would have been more inclin[e]d to take the (12) year plea offered by the gov. the morning of trial," but this is insufficient.[12] "To establish prejudice under such circumstances, the petitioner must show that he would have accepted the plea but for counsel's advice, and that had he done so he would have received a lesser sentence." Wanatee v. Ault, 259 F.3d 700, 703-04 (8th Cir. 2001). The concern is that every defendant who suffers from "buyer's remorse" after a trial will wish they had entered a plea. Here, Movant does not even state he would have accepted the plea.

## B. Prosecutorial Misconduct

Movant asserts two broad areas of prosecutorial misconduct: use of perjured testimony and violations of Brady v. Maryland, 373 U.S. 83 (1963).

### *1. Perjured Testimony*

Movant takes issue with the manner in which Craddock, Kindred and Pruitt characterized their plea agreements. Craddock testified that as a result of his plea agreement he was charged with only one robbery and one gun count even though he had committed a total of seven armed bank robberies. He denied seeking a sentence reduction for the crimes he was charged with, and upon being asked whether the Government could file a motion for downward departure if he complied with his

---

[12]It is also difficult to believe, given his continued adamant insistence that he had nothing to do with the robberies.

agreement Craddock responded "[t]here's no promises made." Tr. at 342-47. It should also be noted Craddock's plea agreement was admitted into evidence. Tr. at 334-35. Kindred testified he "hope[d]" to get a lower sentence but there was "no promise about it." Tr. at 272-73. Pruitt testified it was possible that the other charges against him would be dismissed, but to obtain the dismissal he had to testify truthfully. Tr. at 165-66. Finally, Movant re-asserts the perjury allegation involving Craddock discussed previously in section II(A)(6).

There are two problems with Movant's argument. First, these claims cannot be asserted in a postconviction proceeding. Postconviction proceedings are not substitutes for direct appeal, and cannot be used to assert trial errors that could have been raised on direct appeal. E.g., Auman v. United States, 67 F.3d 157, 161 (8th Cir. 1995) (A claim of prosecutorial misconduct might be cognizable in postconviction proceeding if the underlying facts were not known in time to be raised on direct appeal; for instance, as applied to this case, if the supposed perjury was not known in time to be raised. However, all four instances of supposed perjury were apparent in time to allow the issue to be raised on appeal. In fact, Movant's pro se brief raised the issue of Craddock's date discrepancy. Second, the testimony highlighted by Movant is not perjurious. The issue regarding the dates of the robberies was discussed previously. Kindred's testimony was true: while he hoped for a lesser sentence there were no guaranties because the ultimate sentencing decision is made by the sentencing judge even if the Government filed a motion for departure. Pruitt's testimony that he had to testify truthfully before the Government would dismiss the charges was accurate. The Court also holds Craddock's testimony is not perjury. In context, Craddock did not deny that he would benefit from the plea agreement; he merely expressed his understanding there were no firm promises regarding the length of his sentence and his lack of undersanding about the mechanics and procedures by which any benefits would be realized.

## 2. Brady v. Maryland

Movant contends the Government violated its obligation to provide information that could be used to impeach witnesses in violation of <u>Brady</u> and its progeny.  He alleges Kindred was promised a substantial reduction in his sentence and Shaw's plea agreement was not disclosed.[13]  The first contention is meritless: the Government can ask the Court to depart at sentencing, but it cannot guarantee that the motion will be granted or the extent of any resulting departure.  The second contention is belied by the Record.  Tr. at 392, 396-97.

## C.  Cumulative Error

Movant alleges that cumulative trial error entitles him to relief.  As stated earlier, Movant cannot assert claims of trial error in a postconviction proceeding, so this claim must be rejected.

## D.  Ineffective Assistance of Appellate Counsel

Performance of appellate counsel is governed by <u>Strickland</u>, but "[u]nless there is evidence to the contrary, we assume that counsel's decision not to raise a claim was a strategic decision to emphasize stronger claims at the expense of weak ones." <u>Armstrong v. Gammon</u>, 195 F.3d 441, 444 (8th Cir. 1999).  Williams contends his appellate counsel was ineffective for failing to obtain and review certain portions of the Record and for failing to raise meritorious issues.

Movant complains that appellate counsel did not obtain the transcript of opening statements, closing arguments, voir dire, and jury instructions.  He does not allege there were any errors related to opening statements or closing arguments, so there is no

---

[13]A <u>Brady</u> claim can be raised in a postconviction proceeding.  <u>E.g.</u>, <u>Mandacina v. United States</u>, 328 F.3d 995, 999-1000 (8th Cir. 2003).

apparent need for those transcripts.  The transcript of the Court's reading of the jury instructions does not appear to have been prepared (and hence it was not reviewed), but the instructions themselves are part of the Record and there is no reason to suspect appellate counsel did not look at them.  Movant contends an issue should have been raised with respect to the excusing of Juror No. 20 – but he raised this issue himself in his pro se brief.  In fact, all of the claims he contends appellate counsel should have raised were raised in the pro se brief, but all such claims were rejected as "uniformly without merit."  <u>Williams</u>, 599 F.3d at 834 n.3.  It is fair to believe that if any of the claims had merit, the Court of Appeals would at least have required counsel to brief the issue. The Eighth Circuit's actions reinforce the presumption of reasonableness accorded to counsel's decisions.

## III.  CONCLUSION

The Motion for Postconviction Relief is denied.

IT IS SO ORDERED.

/s/ <u>Ortrie D. Smith</u>
ORTRIE D. SMITH, SENIOR JUDGE
DATE: August 23, 2011                      UNITED STATES DISTRICT COURT